UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHRISTINA ELAINE JONES and DONNA MARTIN JONES, Individually and on Behalf of All Others Similarly Situated, | * * * * | |
| Plaintiffs, | * * | CIVIL ACTION NO. |
| VERSUS | * * | SECTION: |
| WESTLAKE US 2, LLC; WESTLAKE CORPORATION; and EAGLE SPINCO INC., | * * * | MAGISTRATE JUDGE: |
| | * | **JURY TRIAL DEMANDED** |
| Defendants. | | |
| * * * * * * * * * * * * * * * * * * * * * * | * | |

---

## CLASS ACTION COMPLAINT

---

INTO COURT, through undersigned counsel, comes Christina Elaine Jones and Donna Martin Jones, on behalf of themselves and others similarly situated, who file this Class Action Complaint against Westlake US 2 LLC, formerly known as Eagle US 2 LLC, Westlake Corporation, and Eagle Spinco Inc. (collectively, "Westlake"). In support of these claims, Plaintiffs allege as follows:

### PARTIES

*Plaintiffs*

### 1.

Plaintiff, Christina Elaine Jones is a Louisiana citizen who resides in, uses the water in, and owns property affected by Defendants' conduct in Calcasieu Parish, Louisiana.

**2.**

Plaintiff, Donna Martin Jones is a Louisiana citizen who resides in, uses the water in, and owns property affected by Defendants' conduct in Calcasieu Parish, Louisiana.

**3.**

**Plaintiff Class.** The Named Plaintiffs herein propose to proceed on behalf of a class of persons defined as follows:

> *All natural and juridical persons (excluding any state agencies or commissions, and excluding the U.S. federal government and any agencies or departments thereof) who own immovable property in Calcasieu, Cameron, Beauregard, or Jefferson Davis parishes in Louisiana that have been damaged by Westlake's operations of and/or failure to monitor and maintain its Salt Dome Facilities near Sulphur, Louisiana*
>
> -and-
>
> *All natural and juridical persons (excluding any state agencies or commissions, and excluding the U.S. federal government and any agencies or departments thereof) who use the water from the Chicot Aquifer or other groundwater sources in Calcasieu, Cameron, Beauregard, or Jefferson Davis parishes, and who are impacted by Westlake's contamination of the aquifer or other groundwater.*

Excluded from the Class are the Judge to whom this case is assigned and his or her immediate family. Plaintiffs reserve the right to revise the definition of the Class based on information learned through discovery.[1]

### ***Defendants***

**4.**

**Defendant, Westlake US 2 LLC,** formerly known as Eagle US 2 LLC, is a Delaware limited liability company having its principal place of business in Houston, Texas.

**5.**

**Defendant, Eagle Spinco Inc.** is a Delaware corporation having its principal place of business in Houston, Texas.  On information and belief, Defendant Eagle Spinco Inc. is the sole member of Defendant Westlake US 2 LLC.

**6.**

**Defendant Westlake Corporation**, formerly known as Westlake Chemical Corporation, is a Delaware corporation having its principal place of business in Houston, Texas.  Westlake Corporation's common stock trades on the New York Stock Exchange under the ticker symbol "WLK."  On information and belief, Defendant Westlake Corporation ultimately owns and controls Defendant Eagle Spinco Inc. and Defendant Westlake US 2 LLC.

**7.**

Westlake US 2, Westlake Corporation, and Eagle Spinco are hereinafter collectively referred to as "Defendants" or "Westlake."

---

[1] The individually named plaintiffs and the putative class members are hereinafter collectively referred to as "Plaintiffs."

**8.**

Defendants are jointly and solidarily liable for the damages to Plaintiffs.

**RELATIONSHIP BETWEEN THE WESTLAKE ENTITIES**

**9.**

Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation operate as a single business enterprise.  They are instrumentalities, adjuncts, or alter egos of one another.

**10.**

Upon information and belief, the facts support that Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have joined forces for the purpose of accomplishing a common business purpose and are acting as a single business enterprise:

a) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation share an identity or substantial identity of ownership. Among other things, Westlake US 2 LLC and Eagle Spinco Inc. are both subsidiaries of Westlake Corporation;

b) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have unified administrative control, and each entity's functions are supplementary of each other.  For example, all three entities have their registered office and registered agent in Louisiana located at 3867 Plaza Tower Drive, Baton Rouge, LA 70816.  Further, all three entities have the same mailing address of 2801 Post Oak Boulevard, Suite 600, Houston, TX 77056;

c) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation share common employees, common officers, and centralized accounting.  For example, Albert Yuan Chao is an officer of all three entities;

4

d)  The employees of Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have rendered services and continue to render services on behalf of the other entities interchangeably;

e)  Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have paid salaries and expenses for each other's employees and business operations;

f)  Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation commingle funds and do not maintain separate bookkeeping or accounting services;

g)  There is excessive fragmentation of Westlake Corporation and its related entities into separate companies, including Westlake US 2 LLC and Eagle Spinco Inc.  Westlake Corporation has over two dozen subsidiaries;

h)  Westlake Corporation caused the organization of Westlake US 2 LLC and Eagle Spinco Inc., which are affiliates of each other and of Westlake Corporation;

i)  Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have common members. For example, Eagle Spinco Inc. is a member of Westlake US 2, LLC

j)  Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have engaged in undocumented transfers among the entities;

k)  Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation utilize the same properties and use each other's property interchangeably.  For example, all three entities have their principal office located at 2801 Post Oak Boulevard, Suite 600, Houston, TX 77056;

l)  Westlake US 2 LLC and Eagle Spinco Inc. have not received any business other than that given to them by Westlake Corporation;

5

m) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation have unclear allocation of profits and losses among the entities;

n) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation do not follow statutory formalities with respect to transacting business with one another and do not hold regular member or management meetings of each separate entity;

o) Westlake US 2 LLC and Eagle Spinco Inc. are under-capitalized, particularly because each was organized by Westlake Corporation for a limited purpose; and

p) Westlake US 2 LLC, Eagle Spinco Inc., and Westlake Corporation formed a single business enterprise for the purpose of furthering a fraudulent purpose of unlawfully causing environmental damage and contamination in furtherance of advancing their own monetary gains.

**11.**

As a result, each of the Defendants is jointly and severally liable for the acts or omissions of one another and for the damages caused by one another.

**JURISDICTION AND VENUE**

**12.**

This Court has personal jurisdiction over Defendants because Defendants are limited liability companies or corporations with sufficient minimum contact with the State of Louisiana to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Indeed, Defendants conduct substantial business in Louisiana.  This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332 and 1332(d), because the putative class consists of at least 100 Class Members; the citizenship of at

least one Class Member is different from that of Defendants; and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

**13.**

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs Christina Elaine Jones and Donna Martin Jones suffered injury as a result of Defendant's acts in this district, Defendant conducts substantial business in this district, Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

**<u>ALLEGATIONS</u>**

**14.**

Westlake and its related entities  manufacture and/or supply chlorine, caustic soda, chlor-alkali derivatives, polyvinylchloride, petrochemicals, polymers, and fabricated building products. Westlake is one of the largest, if not the largest, producers of low-density polyethylene (LPDE) in the United States. Westlake operates multiple facilities in Calcasieu Parish in and around Westlake, Louisiana, Sulphur, Louisiana, and Lake Charles, Louisiana ("Westlake's Southwest Louisiana Plants"):



**Westlake Chemical facilities:** Houston-based Westlake Chemical has four chemical plants in the Lake Charles area that have a long history of explosions, fires, pollution violations and worker injuries.

**15.**

Article IX, section 1, of the Constitution of the State of Louisiana provides: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."

**16.**

Defendants and their related entities have engaged in a series of activities that have resulted in a pattern of environmental contamination in Calcasieu Parish. "A review of federal and state records reveals that Westlake has a long track record of chemical spills, fires, air quality violations, failed safety inspections, and accidents that have burned and battered dozens of workers in Louisiana."[2]

---

[2] Baurick, Tristan (7 March 2022) "Two explosions follow decades of fires, toxic leaks, and injuries at Westlake Chemical plants." Nola.com.

**17.**

For example, Westlake facilities in Louisiana have had uncontrolled chemical releases including benzene, chloroform, ethylene_dichloride, hydrogen_chloride, and vinyl_chloride.[3] In September 2021, an explosion at Westlake Chemical's Petro Complex in Sulphur, Louisiana injured dozens of workers.[4] In January 2022, an ethylene dichloride tank exploded at a Westlake facility in Westlake, Louisiana injuring several workers and triggering a shelter-in-place order.[5]



A dark cloud of smoke rises over the Lake Charles area after a chemical tank exploded at Westlake Chemical's Lake Charles South plant on Jan. 27, 2022. This photo was taken about four miles from the explosion.

---

[3] Mitchell, David (10 March 2019). "A detailed look at Westlake Chemical plant in Geismar's string of accidental leaks." The Acadiana Advocate.

[4] Askelson, Kristin (26 January 2022). "At least six people injured in Westlake Chemical plant explosion." The Acadiana Advocate; Robinson, Andrea (28 Jan. 2022) "Wednesday's explosion marks second in four months for Westlake Chemical." 7 KPLC News.

[5] *Id.*

**18.**

Westlake's pattern of environmental contamination has been so egregious that, in June 2022, the U.S. Environmental Protection Agency and the Louisiana Department of Environmental Quality filed a lawsuit against several Westlake entities for failing to properly operate, maintain, monitor, and control flares at the petrochemical facilities.[6] The EPA admonished Westlake: "The company regularly 'oversteamed' the flares and failed to comply with other key operating constraints to ensure the volatile organic compounds (VOCs) and hazardous air pollutants (HAPs) contained in the gases routed to the flares are efficiently combusted."[7]  The EPA stated that the pollutants emitted by Westlake "can cause significant harm to public health. VOCs are a key component in the formation of smog or ground-level ozone, a pollutant that irritates the lungs, exacerbates diseases such as asthma, and can increase susceptibility to respiratory illnesses, such as pneumonia and bronchitis. Chronic exposure to benzene, which EPA classifies as a carcinogen, can cause numerous health impacts, including leukemia and adverse reproductive effects in women. Flares are also often large sources of greenhouse gas emissions."[8]

**19.**

That lawsuit ultimately resulted in a settlement wherein Westlake agreed to pay a fine of $1 million and agreed to a plan to upgrade and perform compliance measures estimated to cost $110 million to resolve the complaint. This included pollution control and emission monitoring

---

[6] https://www.justice.gov/opa/pressrelease/file/1511956/download?utm_medium=email&utm_source=gov delivery

[7]   https://www.epa.gov/newsreleases/westlake-chemical-corporation-subsidiaries-agree-reduce-harmful-air-pollution-three-us

[8]   https://www.justice.gov/opa/pr/westlake-chemical-corporation-subsidiaries-agree-reduce-harmful-air-pollution-three-us.

equipment.

**20.**

This present lawsuit is being filed because Westlake's latest environmental catastrophe has resulted in Governor John Bel Edwards issuing Executive Order 160 and declaring a state of emergency related to facilities for which Westlake is responsible:

> Pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, R.S. 29:721 *et seq.*, a state of emergency is hereby declared to exist in the Parish of Calcasieu, as a result of seismic activity, lost cavern integrity, increased hydrocarbon bubbling, and accelerated subsidence, that collectively indicate a potential for structural failure that could potentially threaten the lives and property of the citizens of the State.[9]

**21.**

The State of Emergency was confirmed by the Louisiana Commissioner of Conservation Monique M. Edwards.[10] The Department of Natural Resources, Office of Conservation issued its own Emergency Declaration, wherein it provided details of the area of concern as follows:

> It is hereby declared that the Louisiana Department of Natural Resources, Office of Conservation has received evidence from operators, confirmed by agents and staff of this office, that ground deformation and subsidence is threatening to occur imminently within the following Area of Concern ("AOC"): a circular area with a radius of 3,200 feet…approximately corresponding to the well head of Westlake US 2, LLC's PPG 007B Well (State Serial Number, 67270) and encompassing the Sulphur Mines Salt Dome, approximately one mile west-northwest of Sulphur, Louisiana.[11]

The following map was provided to depict the AOC-Red Zone:

---

[9]    September 20, 2023, Executive Order No. 160 JBE 2023 (https://www.dnr.louisiana.gov/assets/OC/160JBE2023StateofEmergencySulphurMinesSaltDome.pdf).

[10] September 20, 2023, Press Release: "Gov. Edwards and Office of Conservation declare emergency for Calcasieu Parish salt cavern operation" (https://www.dnr.louisiana.gov/index.cfm/newsroom/detail/1229).

[11] September 20, 2023, Department of Natural Resources, Office of Conservation Declaration of Emergency No. 2023-1 (https://www.dnr.louisiana.gov/assets/OC/DeclarationofEmergencyNo20231.pdf).



**Sulphur Mines Area of Concern (3200')**

**22.**

The Office of Conservation's Emergency Declaration further provided:

a) "It is further declared that such imminent ground deformation and subsidence is threatened to occur at an oilfield site or other facility, structure, or pipeline under the Commissioner of Conservation's jurisdiction pursuant to La. R.S. 30:1 et seq."[12]

b) "It is further declared that such evidence is based on recognized criteria,

---

[12] September 20, 2023, Department of Natural Resources, Office of Conservation, Declaration of Emergency No. 2023-1 (https://www.dnr.louisiana.gov/assets/OC/DeclarationofEmergencyNo20231.pdf).

standards, or industrial practices, specifically testing of mechanical integrity of the wells and solution-mined salt caverns within the AOC, observation of bubbling and other surface expression of released hydrocarbons through vertical conduits within the AOC, seismicity monitoring within the AOC, and satellite monitoring of ground subsidence within the AOC."[13]

c) "It is further declared that such imminent subsidence is of such magnitude as to require immediate action to prevent substantial or irreparable damage to the environment or a serious threat to life or safety, namely a significant subsidence resulting in a sinkhole and the potential release of hydrocarbons, brine, hydrogen sulfide, and/or other substances harmful to human health and safety into fresh water supplies, including the Chicot Aquifer, as well as to the surface and into the atmosphere."[14]

d) "It is further declared that such imminent subsidence is an emergency within the AOC that requires immediate action by the operator of record of the subject well, Westlake US 2, LLC (W1039), and other operators of wells and caverns within the AOC and to undertake all necessary and appropriate action to halt the deterioration of the caverns' integrity and to contain, abate, and clean up any pollution source and pollutants related to this emergency."[15]

e) It is further declared that this Declaration of Emergency shall be widely distributed and disseminated to local, state, and federal authorities; residents

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

near the AOC; and members of the general public to aid in governmental coordination and public awareness of this emergency.[16]

**23.**

The two caverns of greatest concern are the PPG-6 and PPG-7.[17] The Office of Conservation stated:

> Ongoing monitoring required by OOC regulations detected a pressure anomaly in December 2021 in caverns on Sulphur Mines Salt Dome and follow-up work indicated a focus on PPG-6 and PPG-7, particularly PPG-7, was warranted. Continuing investigation over the course of 2022 turned up issues with PPG-7's ability to hold pressure and the cavern failed a Mechanical Integrity Test (MIT) in 2022.[18]

**24.**

The Office of Conservation further noted:

> The Office of Conservation's (OOC) primary concern is focused on the brine cavern known as PPG-7, a cavern on the west side of the salt dome, operated by Westlake US 2 LLC. The core issue is that the PPG-7 cavern is unable to maintain a stable pressure without constant pumping of salt water into it and OOC staff have documented a number of sites over the central and western areas of the salt dome where natural gas is bubbling up to the surface in water bodies and near wellheads. In addition, at least one oil seep has been detected and initial subsidence monitoring of the area has revealed a potential accelerating trend of downward movement.[19]

**25.**

Commissioner Edwards warned of threats related to (1) the internal pressure of these caverns and other caverns across the salt dome; (2) seismic activity in the area; (3) subsidence above the salt dome; (4) the extent of natural gas bubbling; (5) potential impacts to nearby

---

[16] *Id.*

[17] September 20, 2023, Press Release: "Gov. Edwards and Office of Conservation declare emergency for Calcasieu Parish salt cavern operation" (https://www.dnr.louisiana.gov/index.cfm/newsroom/detail/1229).

[18] *Id.*

[19] *Id.*

groundwater; and (6) the potential for structural failure.[20]

**26.**

As part of Westlake's Southwest Louisiana Plants, Westlake has operated various facilities at the Sulphur Mines Salt Dome, including but not limited to hydrocarbon storage caverns, brine caverns, multiple injection wells, ponds, pipelines, and other related facilities, outside of Sulphur, Louisiana (hereinafter referred to as Westlake's "Salt Dome Facilities.").[21] Based upon information and belief, Westlake's Salt Dome Facilities are and have been utilized as part of Westlake's Southwest Louisiana Plants. For example, based upon information and belief, Westlake's Salt Dome Facilities have provided and provide necessary storage, key chemical components, and other services that are a part of, and have been essential to, the operation of Westlake's Southwest Louisiana Plants. The Salt Dome Facilities are illustrated in this aerial photograph:

---

[20] *Id.*

[21] Among the injection wells operated by Westlake are SN-971286, SN-32069, SN-974245, SN-37320, SN-973364, SN-973365, SN-67270, SN-57788, and SN-973224. Plaintiffs' claims are not limited to these wells, and Plaintiffs reserves the right to add additional wells and other facilities as more information is obtained.



**27.**

On information and belief, Westlake's operation of and failure to properly monitor and maintain the Salt Dome Facilities has, among other things, contaminated the Chicot Aquifer or other groundwater, as well as caused other severe damage to the environment and property in the area of Westlake's operations near Sulphur, Louisiana. The U.S. Environmental Protection Agency classifies the Chicot system as a "sole-source aquifer," meaning there is no other source of water for people who live between Lake Charles, Lafayette, and Alexandria, Louisiana.[22]

---

[22] https://epa.maps.arcgis.com/apps/webappviewer/index.html?id=9ebb047ba3ec41ada1877155fe31356b

**28.**

The Chicot Aquifer system underlies an area of approximately 9,500 square miles in southwestern Louisiana and is located within the Gulf Coastal Plain physiographic province. The region includes all or parts of 15 parishes in Louisiana—Vernon, Rapides, Evangeline, Allen, Beauregard, Calcasieu, Jefferson Davis, Acadia, St. Landry, Lafayette, St. Martin, Cameron, Iberia, Vermilion, and St. Mary. The Chicot Aquifer system is a major source of groundwater for southwestern Louisiana, accounts for approximately 48 percent of all groundwater use in the State, and provides freshwater for public supply, industry, agriculture, and aquaculture (Collier and Sargent, 2018).[23]



Boundary of the Chicot Aquifer in southwest Louisiana, showing the main watersheds and contributing tributaries

---

[23] Bussell, A.M., and Killian, C.D., 2021, Chicot aquifer system extent in southwestern Louisiana, October 2020.

**29.**

Based on information and belief, Defendants' operational failures of the Salt Dome Facilities and their failure to properly monitor and maintain the Salt Dome Facilities have resulted in subsidence and in the discharge of hydrocarbons, brine and/or other contaminants, which Plaintiffs allege have contaminated the Chicot Aquifer and other groundwater through off-site migration, releases, spills, and/or dumps of contaminants. This contamination and other property damage was caused by the wanton and reckless conduct and negligence of Westlake.

**30.**

Plaintiffs allege that, on information and belief, the contaminants from Westlake's Salt Dome Facilities have migrated into Plaintiffs' property and contaminated the groundwater, surface water, and soils on and under that property, as well as the property of all those similarly situated.

**31.**

Plaintiffs also allege that Westlake's contamination of the Chicot Aquifer, the potable water source, has caused and will continue to cause bodily injury, economic losses, business interruption, increased business expenses, medical expenses, lost wages, and pain and suffering.

**32.**

Plaintiffs allege that Westlake's operation of and failure to properly monitor and maintain the Salt Dome Facilities has resulted in property damage, including but not limited to subsidence and diminution in value of their property.

**33.**

Defendants' conduct was in bad faith, as they knew or should have known that their

conduct in the operation of the Salt Dome Facilities would result in failures at those facilities, and consequent contamination damages, including property damage, health impact damages, economic losses and contamination of the Chicot Aquifer and other groundwater.

**34.**

Because Westlake Corporation is an alter ego of, and/or constitutes a single business enterprise with Westlake US 2 LLC and Eagle Spinco Inc., Westlake Corporation is joint and severally liable for any judgment rendered against the Defendants.

**CLASS ACTION REQUISITES**

**35.**

The Named Plaintiffs and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to Rule 23(a), (b)(2), and (3), and (c)4. of the Federal Rules of Civil Procedure:

35.1 **Numerosity:** The Class consists of more than 100 individuals using the Chicot Aquifer and more than 100 property owners impacted by Defendants' conduct, so numerous that joinder of all members is impracticable. A class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy.

35.2 **Commonality:** Questions of law and fact common to all members of the Class are numerous,; and those common questions of law and fact also predominate over individual issues. Those common questions of law and fact include but are not limited to:

35.2.1  Whether Westlake's conduct alleged herein violates the laws as stated in the Causes of Action section, *infra*;

35.2.2  The steps Westlake could have take to prevent the damages to the class in the form of property damage, health impacts, and economic damages;

35.2.3  The extent of Westlake's knowledge of the hazardous leaks, spills, discharges, and/or faulty equipment or materials that resulted in damages to the class in the form of property damage, health impacts, and economic damages;

35.2.4  Whether Westlake owes a duty to the Class;

35.2.5  Whether Westlake breached those duties to the Class;

35.2.6  Whether Westlake is liable to putative Class Members for damages related to the contamination of soil, surface water, and/or groundwater.

35.2.7  The measure of damages to putative Class Members;

35.2.8  Whether Westlake is liable for attorneys' fees and costs pursuant to applicable law.

35.2.9  The appropriate nature of class-wide relief;

35.3  **Typicality:** The claims of the Named Plaintiffs, with property located within close proximity to Westlake's Salt Dome Facilities, are typical of the claims of the proposed Class Members against Westlake because the Named Plaintiffs reside in Calcasieu Parish and own property propinquitous to Westlake's Salt Dome Facilities that has been contaminated by Westlake's operations. The Named Plaintiffs also use the water in the Chicot Aquifer. Named Plaintiffs and

all members of the Class were damaged by the same wrongful conduct of Defendants. The Named Plaintiffs own property that is approximately 1,400 feet away from the AOC-Red Zone as established in the Office of Conservation's Emergency Declaration:



35.4 **Adequacy of Representation:** The Named Plaintiffs will fairly and adequately protect the interests of the proposed Class, because they both have an interest in preventing or ameliorating future deleterious effects of contamination on their property and in rectifying the damage caused by past contamination to their property and health. The Named Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the Class. The Named Plaintiffs have retained counsel experienced in complex litigation and

class actions. Plaintiffs' counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. The Named Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses. Neither the Named Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class and Subclasses. The Named Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are the Named Plaintiffs subject to any unique defenses.

35.5 **Ascertainability:** The criteria for defining the proposed Class, as set out above, are objectively ascertainable on the face of written instruments—namely, people who own immovable property that has been damaged by Westlake's contamination of the soil, surface water, or groundwater in Calcasieu, Cameron, Beauregard, or Jefferson Davis parishes. Alternatively, all natural and juridical persons who use the water from the Chicot Aquifer or other groundwater in Calcasieu, Cameron, Beauregard, or Jefferson Davis parishes who are impacted by Westlake's contamination of the aquifer.

35.6 Certification of a Class under Fed. R. Civ Pro. 23(B)(1)(A) is appropriate, because the prosecution of separate actions by individuals rather than a Class as proposed would create a risk of inconsistent or varying adjudications and the potential for imposition of inconsistent duties owed  by Westlake and for prejudicial determinations as to the rights of subsequent plaintiffs, as Westlake's conduct has

harmed multiple class members based on a common pattern of conduct, with that harm being of a common character through a common causal process.

35.7 Alternatively, certification of a Class under Fed. R. Civ Pro. 23(B)(2) is appropriate because, due to the widespread effect of the Westlake's actions, any resistance of liability by the Westlake would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

35.8 Alternatively, if damages are deemed an appropriate remedy rather than class-wide adjudication of rights under Fed. R. Civ Pro. 23(B)(1) or injunctive relief under Fed. R. Civ Pro. 23(B)(2), then certification under Fed. R. Civ Pro. 23(B)(3) is appropriate because, as noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

35.9 **Superiority:** Also in satisfaction of Fed. R. Civ Pro. 23(B)(3), the class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

35.9.1 It is desirable to concentrate all litigation regarding the crisis contamination of the soil, surface water, and groundwater within a single forum;

35.9.2 Class litigation is an efficient mechanism for managing the claims of the class members, due to the opportunity to afford reasonable notice of significant phases of the litigation to class members and to permit a systemic and integrated remedy and injunctive relief or, alternatively, distribution of any damages recovered; and

35.9.3 The vindication of public policy interests in addressing contamination in requiring Westlake to comply with the law are implicated and therefore justify the invocation of the process of class litigation, including any attendant costs or burdens.

35.9.4 Upon a determination of liability, causation, and entitlement to remedy, this Court may appoint a special master to administer a restoration plan and/or apportionment among the class and sub-class members of compensation for restoration costs and damages as appropriate.

35.10    Further, even if the Court were to determine that certification is not appropriate as to some issues in this litigation, it may certify the Class for purposes of those particular issues that resolve common, class-wide issues as to which inconsistent adjudication would be detrimental, under Fed. R. Civ Pro. 23(C)(2)(4)).

## CAUSES OF ACTION

### *COUNT 1: Negligence (Class claim)*

**36.**

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

**37.**

Defendants, while engaging in operations at their Salt Dome Facilities as detailed above, have a duty to use reasonable care to avoid damage to others. This duty has existed throughout the time each of the Defendants owned and/or operated the Salt Dome Facilities.

**38.**

Defendants also have and have had a duty to comply with various regulations and laws governing the handling, storage, disposal, and transportation of hazardous substances.

**39.**

As specified in the allegations above, Westlake breached these duties while it operated its Salt Dome Facilities, which has resulted in damage to Plaintiffs and Plaintiffs' Property.

**40.**

In addition, Defendants have and have had the duty to clean up any contamination resulting from their operations, and to prevent it from migrating onto neighboring properties.

**41.**

Defendants also have a duty not conduct its business in a manner that causes bodily injury, economic losses, business interruption, medical expenses, lost wages, or pain and suffering.

**42.**

Defendants breached this duty by operating, monitoring, and maintaining the Salt Dome Facilities in a negligent manner and contaminating the Chicot Aquifer, the potable water source.

**43.**

As a result of each Defendant's breach of these various duties, the groundwater and potable water source is contaminated. Further, the soil, surface water, and groundwater on and underlying the Plaintiffs' Property is catastrophically and dangerously contaminated or otherwise damaged. Defendants have caused property damage, health impact damages, and economic damages, as the result of their negligent operations, monitoring, or maintenance of the Salt Dome Facilities. Defendants are therefore liable for all damages and remedies detailed further below.

_**COUNT 2: Strict Liability (Class claim)**_

**44.**

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

**45.**

Louisiana Civil Code articles 2317-2317.1 provide that a custodian is strictly liable for damage occasioned by the things he owns. Westlake owns and operates the Salt Dome Facilities. Westlake's operations resulted in damage to Plaintiffs'  and their property and contamination of the Chicot Aquifer and other groundwater, surface water, and soil.  Westlake's operations are the cause-in-fact of Plaintiffs' damages.

**46.**

The defects in Westlake's operations caused an unreasonable risk of harm to Plaintiffs. The burden of preventing hazardous releases into the water and soil is slight in comparison to the gravity of the harm to the Plaintiffs.

**47.**

Westlake knew or should have known, in the exercise of reasonable case, of the unreasonable risk of releasing contaminants into the surface water, groundwater, soil, and other damages as a result of its faulty operations of the Salt Dome Facilities.

**48.**

The damage Plaintiffs suffered could have been prevented by Westlake's exercise of reasonable care.

**49.**

Plaintiffs suffered damages as the result of Westlake's action, and Westlake is strictly liable for those damages.

### COUNT 3: Breach of Louisiana Mineral Code Article 10 (Class claim)

**50.**

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

**51.**

Under La. R.S. § 31:10, an owner of rights in a common source or supply—such as the common groundwater aquifer beneath Plaintiffs' property—may not "make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights or that may cause damage to him."

**52.**

Defendants' actions in engaging in operations that have polluted groundwater under Plaintiffs' Property is a violation of this prohibition under Mineral Code Article 10.

**53.**

As a result of Defendants' breach of Mineral Code Article 10, they are liable to Plaintiffs to remediate the groundwater underlying their properties. Defendants are therefore liable for the groundwater-related damages and remedies detailed further below.

### COUNT 4: Trespass (Class claim)

**54.**

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as

if fully set forth herein.

**55.**

The Defendants owed (and continue to owe) a duty to Plaintiffs not to trespass.

**56.**

The Defendants' actions have resulted in property damage and environmental contamination of the soil and surface water on, and the groundwater underlying, Plaintiffs' property.

**57.**

The ongoing invasion of the Plaintiffs' property rights constitutes a continuing trespass on the Plaintiffs' property.

**58.**

Plaintiffs aver that the Defendants' continuous actions regarding the failure to maintain, monitor, and reasonably operate the Salt Dome Facilities, including the storage and brine caverns, have resulted in an encroachment of the contamination and/or other property damage that constitutes a continuous and unlawful invasion of Plaintiffs' rights. Plaintiffs are entitled to have this trespass abated. The contamination or other property damage is causing new and ever-increasing damage to the Chicot Aquifer and Plaintiffs' property, and such damage will continue until the contamination halted.

**59.**

This trespass has and will continue day-to-day until Defendants' offending conduct is abated.

**60.**

The Plaintiffs aver that they are entitled to compensatory damages because of Defendants' acts and omissions and are entitled to injunctive relief in the form of abatement, restoration of the land, water, and groundwater, and ongoing maintenance and repairs of Property.

**61.**

Further, Defendants' trespasses were conducted in legal and moral bad faith as they acted with reckless indifference and in wanton disregard of Plaintiffs' property rights. Accordingly, Plaintiffs are entitled to disgorgement of Defendants' revenues because of Defendants' moral bad faith trespasses.

**62.**

Plaintiffs desire and are entitled to require Defendants to return the Property to the condition it was in before the contamination and/or other damage occurred. In the alternative, Plaintiffs desire and are entitled to damages to cover the cost of restoring the Property to its prior condition.

### _COUNT 5: Nuisance (Class claim)_

**63.**

Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

**64.**

In addition to the basic Civil Code article 2315-based duties discussed above, Defendants each have the specific duty to Plaintiffs owed to a neighbor under Civil Code articles 667, _et seq._

**65.**

Defendants' activities have severely deprived Plaintiffs of the enjoyment of their own property, as the ability to enjoy their property as they see fit is wholly undermined by the extraordinary contamination and/or other damage of their property and the groundwater underlying their property by Defendants' actions. Defendants have also caused economic and health impact damages.

**66.**

Plaintiffs own neighboring properties to Westlake's Salt Dome Facilities.

**67.**

Defendants knew or should have known that their activities would cause Plaintiffs' economic losses, health impact damages, and the contamination and/or other damage of the Plaintiffs' properties. This includes, but is not limited to, their negligent operation of their Salt Dome Facilities.

**68.**

Defendants have breached their vicinage duties to Plaintiffs under Civil Code article 667.

**69.**

The breach of these duties has caused damage to Plaintiffs through the contamination of their properties, economic losses, and health impact damages. Defendants are therefore liable for all damages and remedies detailed further below.

### *COUNT 6: Louisiana Environmental Quality Act ("LEQA") Liability (Class claim)*

**70.**

The Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

**71.**

Plaintiffs assert a public law cause of action for violations of LEQA, La. R.S. § 30:2001, *et seq.*, and its citizen suit provisions in response to Defendants' ongoing violations of environmental statutory and regulatory provisions designed to protect the public's safety and constitutional right to a safe and clean environment.

**72.**

These violations include the release of hazardous substances from the Westlake's Salt Dome Facilities, Defendants' causing the contamination of and other damages to Plaintiffs' properties, and Defendants' causing the contamination of the waters of the State of Louisiana.

**73.**

The citizen suit provisions of LEQA are designed to allow any person or entity with an interest that "is or may be adversely affected" by violations of state environmental laws to bring an enforcement action against the responsible party or parties and otherwise seek redress.

**74.**

The LEQA prohibits the discharge of pollutants into the air, waters, subsurface waters, or ground as the result of a prior act or omission. La. R.S. § 2004(10). The LEQA prohibits discharging and/or allowing the discharge of any waste or any other substance that will tend to cause water pollution in violation of any rule, order, or regulation. La. R.S. § 30:2076(A)(1)(a).

31

The LEQA likewise prohibits the discharge of hazardous wastes into the underground waters of the state. La. R.S. § 30:2076(F).

**75.**

Defendants are all currently in violation of the LEQA as a result of their acts and omissions at and near Westlake's Salt Dome Facilities that have resulted in the ongoing unlawful discharge of contaminants into the soil, surface waters, groundwater, and subsurface waters of the State of Louisiana, causing and tending to cause water pollution.

**76.**

More specifically, on information and belief, Westlake's Salt Dome Facilities have released contaminants that include, but are not limited to, hydrocarbons, brine, solid and hazardous waste, radioactive materials and radionuclides, volatile organics, semi-volatile organics, and metals, including known and likely human carcinogens.

**77.**

Defendants' operations and works on and near Westlake's Salt Dome Facilities created and contributed to a commingled plume of contamination that continues to discharge, spill, drain, leak, seep, emit, and otherwise escape into the soil, groundwater, and subsurface waters of the State of Louisiana in violation of the LEQA.

**78.**

Defendants have also failed to take the necessary steps to stop the ongoing discharge of contaminants on and near Westlake's Salt Dome Facilities. This omission constitutes an ongoing violation of the LEQA as the contamination continues every day to discharge further into the soil, groundwater, and subsurface waters of the State of Louisiana.

**79.**

Plaintiffs have an interest in protecting their own property and the source of their own groundwater from the contamination that continues to discharge without abatement on and near Westlake's Salt Dome Facilities. The interest "is or may be adversely affected" by Defendants' ongoing LEQA violations.

**80.**

By failing to comply with the requirements of the LEQA, Defendants have injured, threatened to injure, and will continue to injure or threaten to injure human health, the environment, and the health-related, aesthetic, and economic interests of Plaintiffs.

**81.**

The injuries, risks, and damages are directly traceable to Defendants' LEQA violations, and by addressing the violations, including complete removal of the contaminants, Plaintiffs' injuries will also be addressed.

**82.**

Unless abated by an order of the Court, the violations complained of herein are causing and will continue to cause irreparable injury to the Plaintiffs, the public, and the environment at, around, and in the vicinity of Westlake's Salt Dome Facilities.

**83.**

Pursuant to La. R.S. § 30:2029, Plaintiffs will post a bond in the amount of $100.00, immediately upon order of this Court.

## GROUND WATER ACT REMEDIES AND OTHER RELIEF

### 84.

Plaintiffs incorporate all of the above allegations and causes of action as if incorporated specifically into this section of this Complaint.

### 85.

Defendants are liable to provide a full cleanup of the properties of Plaintiffs and all those similarly situated as required under the injunctive remedies under LEQA and pursuant to Plaintiffs' other causes of action.

### 86.

Pursuant to the Louisiana Ground Water Act, Defendants are liable to fund the "most feasible plan" to "evaluate or remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people."  La. R.S. § 30:2015.1.

### 87.

In addition to groundwater remedies, Defendants are liable to Plaintiffs and all those similarly situated for compensatory damages for the cost to fully remediate the soil and surface water on the Plaintiffs' properties, to restore the Plaintiffs' properties to the condition they were in prior to the contamination by Defendants' operations.

### 88.

Defendants are liable for all costs and expenses, including expert witness fees and reasonable attorneys' fees, incurred by Plaintiffs to remedy the contamination of their properties by Defendants, pursuant to the Louisiana Ground Water Act and under any other applicable law.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiffs demand judgment against Defendants, providing the following relief:

(a) Class certification of the classes of Plaintiffs as alleged herein;

(b) Compensatory damages to be determined at trial, including for the cost to remediate Plaintiffs' properties and for any diminution of value of the Plaintiffs' properties;

(c) Injunctive relief requiring remediation or restoration of the soil, surface water, and groundwater on and underlying the Plaintiffs' properties;

(d) Injunctive relief requiring the prevention of any further migration of hazardous substances or any other pollutants from Defendants' property onto or underneath Plaintiffs' properties;

(e) Injunctive relief providing for the supply of potable water to the classes of Plaintiffs;

(f) Civil Penalties as provided for under any applicable law;

(g) Exemplary damages as provided for under any applicable law;

(h) Attorneys' fees, expert costs, and all other expenses allowed under the Louisiana Ground Water Act, an/or any other applicable law;

(i) Injunctive relief, damages, and civil fruits from the bad faith trespass by Defendants onto Plaintiffs' Property;

(j) Repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Plaintiffs' for a period of time deemed appropriate by the Court;

(k) Costs to provide safe and usable water services to Plaintiffs for a period of time deemed appropriate by the Court, via preliminary and permanent injunctive relief;

(l)  Damages associated with property damage, including but not limited to subsidence and structural damage;

(m) Damages associated with diminution in the value of property;

(n)  Damages associated with bodily injury, economic losses, medical expenses, lost wages, lost income, lost or impaired earning capacity, pain and suffering, lost business profits, and reduced property values,

(o)  Damages associated with mental anguish, fear, and stress related physical symptoms;

(p)  Damages associated with business interruption or increased business expenses as the result of the contamination; and

(q)  Pre-judgment and post-judgment interest to the maximum extent and at the maximum interest allowed by law; and

(r)  Such other relief as the Court determines to be appropriate under law and equity.

## DEMAND FOR JURY TRIAL

### 89.

Plaintiffs demand that this case be tried to a jury.

Respectfully submitted,

*/s/ Gladstone N. Jones, III*

_____

Gladstone N. Jones, III (LA Bar No. 22221)
Lynn E. Swanson (LA Bar No. 22650)
Kevin E. Huddell (LA Bar No. 26930)
Michael P. Arata (LA Bar No. 21448)
Alayne Gobeille (LA Bar No. 33856)
Thomas F. Dixon (LA Bar No. 38952)
Rosa E. Acheson (LA Bar No. 39775)
JONES SWANSON HUDDELL LLC
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
Email: gjones@jonesswanson.com
khuddell@jonesswanson.com
lswanson@jonesswanson.com
marata@jonesswanson.com
agobeille@jonesswanson.com
tdixon@jonesswanson.com
racheson@jonesswanson.com

-and-

Bernard E. Boudreaux, Jr. (LA Bar No. 02219)
John T. Arnold (LA Bar No. 31601)
**JONES SWANSON HUDDELL LLC**
One American Place
301 Main Street, Suite 1920
Baton Rouge, LA 70801
Telephone: 225-810-3165
Facsimile:  225-810-3169
Email:  bboudreaux@jonesswanson.com
jarnold@jonesswanson.com

***Counsel for the Plaintiffs and Putative Class***